

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NB/CCC:MRM                                  *610 Federal Plaza*
F. #2014R00668                              *Central Islip, New York 11722*


July 21, 2020

<u>By Email and ECF</u>

The Honorable Joanna Seybert
United States District Court
Eastern District of New York
1030 Federal Plaza
Central Islip, New York 11722

Re:    United States v. Raphael Osborne
        <u>Criminal Docket No. 14-264 (S-5) (JS)</u>

Dear Judge Seybert:

The government respectfully submits this letter response in opposition to petitioner Raphael Osborne's petition pursuant to 28 U.S.C. § 2255 to vacate his conviction. <u>See</u> <u>Defendant's 28 U.S.C. § 2255 Motion</u>, 14-CR-264 (JS), ECF Docket No. 603 ("Def. Mot." or the "petition"). On April 11, 2016, following a month long trial, a jury convicted Osborne of all twenty-one counts of a superseding indictment charging him with: (1) racketeering in violation of 18 U.S.C. § 1962(c) (Count One); (2) racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count Two); (3) Hobbs Act robbery conspiracy ("the Fish robbery") in violation of 18 U.S.C. § 1951(a) (Count Three); (4) Hobbs Act robbery ("the Fish robbery") in violation of 18 U.S.C. § 1951(a) (Count Four); (5) brandishing firearms during crimes of violence, the Fish robbery and robbery conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Five); (6) Hobbs Act robbery conspiracy ("the Trackside robbery") in violation of 18 U.S.C. § 1951(a) (Count Six); (7) Hobbs Act robbery ("the Trackside robbery") in violation of 18 U.S.C. § 1951(a) (Count Seven);(8) brandishing a firearm during a crime of violence, the Trackside robbery and robbery conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Eight); (9) murder conspiracy in violation of 18 U.S.C. § 1959(a)(5) (Count Nine); (10) attempted murder of Maurice Gardner in violation of in violation of 18 U.S.C. § 1959(a)(5) (Count Ten); (11) assault with a dangerous weapon of Gardner in violation of 18 U.S.C. § 1959(a)(3) (Count Eleven); (12) witness retaliation of Gardner in violation of 18 U.S.C. § 1513(a)(1)(B) (Count Twelve); (13) witness retaliation conspiracy of Gardner in violation of 18 U.S.C. § 1513(f) (Count Thirteen); (14) discharging a firearm during crimes of violence, the shooting of Gardner, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Fourteen); (15) attempted murder of rival gang member (Johnny Green) in violation of 18 U.S.C. § 1959(a)(5)

(Count Fifteen); (16) assault of a rival gang member (Green) in violation of 18 U.S.C. § 1959(a)(3) (Count Sixteen); (17) discharging a firearm during crimes of violence, the shooting of Green, in violation of 924(c)(1)(A)(i) (Count Seventeen); (18) conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(iii) (Count Eighteen); (19) use of firearms during a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Nineteen); (20) conspiracy to murder and assault of rival gang members with dangerous weapons in violation of 18 U.S.C. §§ 1959(a)(5), 1959(a)(6) (Count Twenty); and illegal possession of ammunition in violation of 18 U.S.C. §§ 922(g), 924(a)(2) (Count Twenty-One). See United States v. Raphael Osborne, 14-CR-264 (S-5) (JS), Verdict Sheet, Court Exhibit 13, ECF Doc. No. 266. This Court sentenced Osborne principally to consecutive life terms of imprisonment on Counts One, Two and Eighteen; consecutive terms of 300 months on Counts Five, Eight, Fourteen, and Seventeen; a consecutive term of 60 months on Count Nineteen; concurrent terms of 240 months on Counts Three, Four, Six, Seven, Ten, Eleven, and Sixteen; concurrent terms of 120 months on Counts Nine, Fifteen, Twenty and Twenty-One; and concurrent terms of 360 months on Counts Twelve and Thirteen. As set forth in the written judgment, the aggregate term of imprisonment was three consecutive life terms plus 135 years. The Court also imposed a mandatory assessment of $2,100.

Osborne subsequently appealed his conviction. On appeal, Osborne challenged: (1) the sufficiency of the evidence underlying his conviction; (2) the district court's denial of his Batson challenge; (3) the applicability of the Pinkerton theory of liability; (4) the district court's denial of his pre-trial Franks motion; (5) the district court's ruling precluding the defendant from calling, inter alia, Detective John Mitchell as a witness at trial; (6) the admission of certain testimony from a cooperating witness; (7) the admission of certain photographs; and (8) that the sentence of the district court was substantively unreasonable. The Second Circuit issued a summary order rejecting all of the defendant's arguments and affirming the judgment. See United States v. Osborne, 14-CR-264 (S-5) (JS), Second Circuit Mandate, ECF Doc. No. 556.

On December 5, 2019, Osborne, proceeding pro se, filed the instant petition pursuant to 28 U.S.C. § 2255 seeking to vacate his conviction. In the petition, Osborne raises seven claims which he alleges require vacatur of his conviction. Osborne's seven claims fall within three categories: (1) five of the claims relate to ineffective assistance of counsel, either trial counsel or appellate counsel; (2) one claim alleges that there is "newly discovered evidence" requiring vacatur of certain counts of conviction; and (3) the final claim alleges that pursuant to United States v. Davis, 139 S. Ct. 2319 (2019), his convictions for Section 924(c) violations must be dismissed because they relied on a no longer valid predicate crime of violence. As set forth below, each of Osborne's claims in the petition are without merit.

FACTUAL BACKGROUND

I.    Overview

Raphael Osborne's April 17, 2013 arrest and later conviction arose out of his participation in and direction of the Roosevelt, New York "set" of the Rollin' 60s Crips, a nationwide street gang with members on Long Island, New York (also referred to herein as the

2

"Rollin' 60s" or "the gang").  (T. 269, 271, 278, 908, 1014-15, 1378-80, 2005, 2095-96).[1] Osborne, whose gang name was "Gusto," was the leader, and founder, of the Rollin' 60s Crips. (T. 271, 278, 908, 1014-15, 1378-80, 2005, 2095-96).

II.     The Trial

        At a five-week trial commencing March 8, 2016, the government provided a multitude of evidence, including: (1) testimony of four former members of the Rollin' 60s Crips (Aaron Halyard, Reynaldo Hernandez, Essix Robinson, and Denzel Smith), some of whom participated in the crimes at issue; (2) testimony of a close associate of the Rollin' 60s (Jeffrey Appiagyei), who participated in Osborne's narcotics dealing operation; (3) the testimony of Daron Morris, who participated in drug trafficking and robberies with Osborne and to whom Osborne admitted that he attempted to kill a person (Maurice Gardner) cooperating with local law enforcement; (4) the testimony of various federal and local law enforcement officers; (5) audio recordings of cell phone conversations and copies of text messages; (6) social media postings and photographs; (7) audio recordings of gunfire; and (8) the testimony of several expert witnesses.

   A.   The Enterprise: The Rollin' 60s Crips

        The Rollin' 60s Crips gang originated in Los Angeles, California and is comprised of smaller sets located throughout the United States.  (T. 269, 289-91, 1026-27). Across the country, Rollin' 60s Crips members identify themselves, to other members as well as to rival gangs, by wearing the gang's colors — primarily the color blue — and by use of tattoos, hand signs and graffiti.  (T. 293-354, 1040-49, 1393-1403, 2102-07).

        The Rollin' 60s Crips set based in Roosevelt, New York was founded by Osborne, along with Daquan Chambers ("Dulo") and Johnny Green ("J-Loc"), in or about 2003.  (T. 279, 293, 1028, 1071).  Among other practices, Roosevelt Rollin' 60s members conducted formal meetings known as "C-13s" (T. 1049-52, 1411, 2100), pooled resources to purchase firearms to be made available to the gang generally (T. 355-62, 691-92, 714, 1022-23, 1061-63, 1412, 2101-02), and contributed money to support incarcerated members (T. 354-55, 1052-55, 1389-90).  To enrich themselves and to maintain respect for the gang, Roosevelt Rollin' 60s members also engaged in criminal activity ("put in work"), including murder, robbery and narcotics trafficking.  (T. 1052-55, 1061-63).  Indeed, participation in these types of crimes affected the degree of respect afforded members[2] (T. 899, 1016-22, 1068, 1387, 2013, 2095), who were assigned different ranks, ranging from "Big Whale," Osborne's

---

[1]     The factual background set forth in this section is based on the trial transcript of United States v. Osborne, 14-CR-264 (S-5) (JS), held March 8, 2016 through April 11, 2016. Parenthetical references to "T." are to specific pages of the trial transcript.

[2]     Involvement in these activities also could lead to the induction of new gang members.  (T. 282-83, 1017-18, 1383-84, 2013-14).

position, to "Big Hoodstas" or "Big Hoods," followed by "Hoodstas," "Baby Hoods" and "Tiny Hoods" (T. 279, 1025, 1228-50, 1386-89, 2096). The more "work" put in on behalf of the gang, the higher the rank. (T. 280-81, 502-03, 899-900, 1028, 1068, 1387, 1431-34, 2102).

Although gang members, including Osborne, maintained contact with the nationwide leadership of the Rollin' 60s Crips, Osborne had final say in the local operations of the gang. (T. 291, 1026-27). Under Osborne, members were obligated to: (1) refuse cooperation with law enforcement officials; (2) attack, injure and kill rival gang members on sight and by whatever means available (the "on sight rule");[3] (3) maintain respect for the gang and its territory; and (4) remain loyal to the gang above all else. (T. 286-88, 481-505 878-82, 1017-18, 1029-33, 1070-71, 1407-11, 1413, 2098-99). Gang members who violated the rules, or failed to follow Osborne's instructions, were disciplined. The form of the discipline would vary depending on the nature of the infraction. Minor infractions of gang rules could result in a beating or expulsion from the gang.[4] More serious infractions, such as cooperating with law enforcement against the gang, were punishable by death. (T. 288, 1024, 1409, 2100).

## B. The Conspiracy to Murder Rival Gang Members (Count Twenty)

As noted above, persons joining the Rollin' 60s were made aware of the "on sight rule" that existed within the gang. (T. 487, 501, 2098). This rule required gang members to shoot, kill, stab or fight any members of the rival Bloods gang whenever and wherever encountered. (T. 483, 490-91, 878-82, 1029-33, 1413, 1465, 2098-99). The "on sight rule" remained in effect the entire time Osborne was the leader of the Roosevelt Rollin' 60s, from 2003 until his arrest in April of 2013. (T. 881).

The results of this Osborne-imposed rule were staggering. For example, on October 21, 2006, Rollin' 60s member Devon Cabrera, also known as "Sty," chased Bloods member Kail Ferro, also known as "Beast," down Park Avenue in Roosevelt, and shot Ferro in the back, killing him, for no reason other than the lack of respect demonstrated by that Bloods member's decision to walk in enemy territory. (T. 495-97, 1068-71). Similarly, on June 22, 2008, fifteen-year-old Rollin' 60s member Cody Hernandez, also known as "Monsta C," shot and killed Bloods member Lord Carter based on nothing other than Carter's gang affiliation.[5] (T. 488-89, 1074-75).

---

[3]     This rule was established by Osborne, Chambers and Green. (T. 483, 490-91, 878-82, 1029-33, 1413, 1465, 2098-99).

[4]     When Rollin' 60s members "Rock" and "Melman" failed to attend a meeting called by Osborne in December of 2010, both individuals were disciplined by the gang. Specifically, Rock was robbed, and Melman was expelled from the gang. (T. 531-32, 1035-37).

[5]     There were many other examples of Osborne and his fellow gang members committing acts of violence against rival gang members s that were proven at trial, but the

C.  The Fish Robbery (Counts Three and Four)

Also in the Fall of 2010, Osborne and Halyard, with the aid of several other Rollin' 60s members, committed a robbery of a marijuana dealer known as "Fish." (T. 455-56).  In this case, it was Halyard who provided Osborne with information from two lower level gang members, Kwame Lake and Terrell Dash, about a marijuana supplier named "Fish" who might be a good robbery target. (T. 455-57, 837).  In anticipation of the robbery, Osborne and Halyard began making small purchases of marijuana from Fish to establish a trust relationship.[6]  Eventually, however, they ordered a much larger quantity (several pounds) of marijuana that they intended to rob.  On the day of the robbery, Reynaldo Hernandez drove Osborne and Halyard to meet "Fish."  Upon arrival, Halyard entered "Fish's" vehicle, and took possession of the drugs, at which point Halyard displayed a firearm.  Osborne then pulled "Fish" out of his car and hit Fish with the butt of a gun. (T. 459-60, 838-841, 1012-13, 1154).  The proceeds of the robbery were later distributed among the participants, including Lake and Dash. (T. 461-463, 842, 1013).  Osborne and Halyard sold the marijuana that was stolen during the robbery. (T. 455-463, 1154-1155).

D.  The Trackside Robbery (Counts Six and Seven)

In the Fall of 2010, Osborne approached longtime, high ranking Rollin' 60s member Aaron Halyard, who, like Osborne, had recently returned from prison and was in need of money, with a plan to rob a drug dealer. (T. 449-50).  Shortly thereafter, Osborne and Halyard, along with fellow Rollin' 60s members Eric Smith and Bryan Henry, and the drug dealer's cousin (who had provided Osborne with the target) drove to the "Trackside" neighborhood of Hempstead in Henry's car, with firearms. (T. 449).  There, Halyard and Smith, armed with the firearms, proceeded to the target's apartment, where they robbed the drug dealer of 15 to 20 grams of crack cocaine, five grams of cocaine and $1,000. (T. 450-52).  These proceeds later were divided among all participants, with Osborne obtaining a portion of the drugs to sell. (T. 447-454, 798).

E.  The Plot and Attempt to Murder Informant Maurice Gardner (Counts Nine to Fourteen)

In the Spring of 2012, members of the Federal Bureau of Investigation's ("FBI") Long Island Gang Task Force and the Nassau County Police Department ("NCPD") began conducting an investigation into the activities of the Rollin' 60s. (T. 171).  During the course of that investigation, a member of the Rollin' 60s, Maurice Gardner, began operating as a confidential informant for the FBI. (T. 171-72).  In that capacity, Gardner purchased five firearms from members of the Rollin' 60s, including from Halyard and Derick

---

government has limited the instant response to those crimes which are relevant to the issues raised in the petition.

[6]     The marijuana that was being purchased to build trust with "Fish" was then resold by Osborne and Halyard, both of whom were in need of money.

Hernandez.  At trial, the government called Special Agent ("SA") David Biddiscombe who offered evidence of those controlled purchases.  (T. 171-172).  The first controlled purchase that SA Biddiscombe discussed at trial was a May 2, 2012 purchase of a 7.65 caliber firearm from Rollin' 60s member Derick Hernandez.  (T.171-181).  The next controlled purchase that SA Biddiscombe discussed at trial was a May 15, 2012 purchase of a .357 caliber firearm from Rollin' 60s member Aaron Halyard.  (T. 181-187).  This purchase occurred at Osborne's residence at 107 Debevoise Street, Roosevelt, New York.  (T. 184).  The third controlled purchase that SA Biddiscombe discussed at trial was a May 23, 2012 purchase of three firearms from Halyard.  (T. 187-191).  This deal occurred on the street in front of Osborne's residence.  (T. 189).

        Thereafter, SA Biddiscombe discussed an attempt to conduct a controlled purchase of a .40 caliber firearm from Osborne himself on June 7, 2012.  (T. 191-194).  In that instance, following a discussion between Osborne and Gardner regarding Osborne selling Gardner a firearm, Gardner did not purchase the firearm.  (T. 193).  As cooperating witnesses Halyard and Hernandez explained, Osborne did not consummate that transaction with Gardner because Osborne had become suspicious of Gardner and the circumstances under which the attempted purchase occurred.  (T. 583-585, 1285-1288).

        While the law enforcement investigation was ongoing, Osborne learned of information indicating that Gardner was working as a federal informant.  (T. 590, 1287, 1847, 2038).  As a result, Osborne and Hernandez decided to kill Gardner.  (T. 590-91, 1842-43).  To commit the murder, Derick Hernandez recruited Denzel Smith, a 17 year-old who was interested in joining the gang.  (T. 2008, 2012-13, 2038-51).  At a meeting attended by Osborne, Hernandez, Kurtis Philip and Smith prior to the planned murder, Osborne told Smith that "when you hit him, you got to leave him . . . he got to get left."  (T. 2048).  Smith understood this to mean that when he shot Gardner, Smith was to make sure he was dead. (T. 2039-2051, 2200).

        On October 13, 2012, Smith met Hernandez and Philip at Hernandez's home in Roosevelt, where they developed a plan to lure Gardner out to kill him.  (T. 2052-56).  Hernandez, Philip and Smith, who was carrying a 9 mm pistol that had been provided by Hernandez,[7] proceeded to the Heights section of Hempstead, New York where Gardner lived.  (T. 2053, 2057-58).  There, Hernandez met Gardner while Philip accompanied Smith to the location where Smith would lie in wait.  (T. 2060-61).  As Hernandez and Gardner approached Smith, Hernandez began to cross the street and Gardner began to run.  Smith

_____

        [7]     A ballistics expert compared the shell casings recovered from the Gardner attempted murder, the August 30, 2012 Crips shooting of Bloods member Cornell Brown, and the March 21, 2012 Crips shooting, in which Crips member Jahmani Hamilton shot at Bloods member Christopher Anderson, and concluded that the same firearm was used in all three shootings.  (T. 1437-39, 2016-22, 2184, 2530).

shot Gardner several times as Gardner attempted to escape.  Gardner fell to the ground, while Smith and Hernandez fled the scene in opposite directions.[8]  (T. 2052-2073).

In the wake of the shooting, civilian eye witnesses called 911 and members of law enforcement responded to the scene.  (T. 1964-77).  Gardner remained conscious for a short time before being transported by ambulance to a local hospital.  (T. 2236-37).  There, Gardner received emergency lifesaving treatments from medical professionals to address the five gunshot wounds he had sustained.  (T. 1183-88).  Although Gardner ultimately survived, he was left permanently paralyzed from his waist down.  (T. 1189-99).  After he awoke from a long coma, Gardner told state law enforcement officials that he saw who had shot him and identified Osborne as the shooter.  (T. 2430-2442).  Throughout the prosecution and trial of this case, Gardner has maintained this mistaken belief.

F.  The Attempted Murder of Green (Counts Fifteen to Seventeen)

On the night of January 30, 2013, Osborne and fellow gang members Rommel Lobban ("Rah") and Merlyn Benitez ("Frankie C") conspired to and then attempted to kill Bloods member Johnny Green.  Driving in Lobban's silver four-door Chevy Impala, Osborne fired several shots at a vehicle in which Green was riding with others.  Bullets ripped through the vehicle, including a bullet that passed through the driver's headrest and the back seat. (T 921-32, 959-74).  Green was struck once in the stomach, with the bullet lodging in his exterior fat.  (T 2302-03).  At the scene of the shooting, law enforcement officers recovered eight 40-caliber shell casings and two 45-caliber shell casings.  (T. 935-44).

Subsequently, Osborne told Halyard that he "and Frank just shot up a guy named Fat Johnny."  (T. 601).  In response to Halyard's question about what Green "got hit with," Osborne replied, "the forty and the four pound," meaning a 40-caliber and a 45-caliber firearm.  (T 600-06, 861-64).

In a later conversation at which Halyard was present, Osborne defended gang member and best friend Lobban[9] from gang chiding due to Lobban's decision to run from police attempting to stop him in his car about a month after the Gardner shooting.[10]  During the course of the conversation, Osborne explained that Lobban knew that law enforcement

---

[8]     Derick Hernandez was stopped by the Hempstead Police Department in the vicinity of the shooting and arrested for marijuana possession.  (T. 2242-45).

[9]     Halyard, Reynaldo Hernandez and Robinson testified that Lobban was Osborne's best friend within the gang and often served as Osborne's driver.  (T. 604-05, 1148, 1448).

[10]    Police records confirmed that on March 2, 2013, NCPD detectives, George Colby and John Mitchell, attempted to stop Lobban while he was driving a gray Chevy Impala. Lobban led them on a pursuit, which ended in Lobban's apprehension and arrest for marijuana possession.  (T. 2414-21).

officials were interested in examining the silver Impala owned by the mother of Lobban's child in connection with the shooting of Fat Johnny.[11]  (T. 605-06, 674-75, 863-84).

### G.  Corroborating Evidence

The testimony of the cooperating witnesses was corroborated by, among other things, the testimony of various federal and local law enforcement officers (see, e.g., T. 60-95 (drugs dropped by Osborne), 170-94 (audio and video recording of gun transactions), 933-1007 (recovery of handgun from Osborne), 1202-10 (surveillance video), 1570-74 (search-Crips graffiti), 1767-81 (search-recovered ammunition), 1697-71, 1726-33, 1740-49, 1749-67, 1981-95, 2307-42 (crime scene evidence), 1721-25, (photographs), 1783-89 (motor vehicle records), 1791-1811 (Osborne's arrest), 2239-46 (Derick Hernandez stop); audio recordings of cell phone conversations and copies of text messages intercepted via the wiretap of Osborne's cell phone during the early months of 2013 (see, e.g., T. 138-69, 2273-94 (and government exhibits)); social media postings and photographs demonstrating the existence of the Rollin' 60s Crips enterprise, the gang's structure, and Osborne's position within the gang (see, e.g., T. 264-65 (stipulation and government exhibits)); ShotSpotter audio recordings of gunfire from several shooting incidents (see, e.g., T. 975-93 (and government exhibits)); and the testimony of several expert witnesses, including a ballistics expert and medical doctors (see, e.g., T. 29-59 (drug expert); T. 97-138 (chemist); T. 1181-1202, 2299-2307 (medical); T. 2481 (ballistics)).

### H.  Defense Case

Defense counsel advised the Court that Osborne was interested in calling one of the individuals — Derick Hernandez — involved in the attempted murder of Gardner (T. 2553-54) and the two NCPD detectives — George Colby and John Mitchell — who were most involved in that investigation in his defense.  The reasons proffered by Osborne for calling Det. Mitchell were, in essence, attempts to relitigate information contained in a wiretap affidavit that the Court had already ruled on in pre-trial motions.  The Court denied Osborne's attempt to call Det. Mitchell, citing the fact that the wiretap affidavit had already been decided and was not an issue for the jury to decide.  Furthermore, Det. Mitchell's partner, NCPD Det. George Colby ("Det. Colby"), who had worked the case with Det. Mitchell, had already been called on the government's case and the defense had an opportunity to cross-examine Det. Colby about the very same topics the defense now sought to raise with Det. Mitchell.[12]  The Court denied Osborne's application.  (T. 2554-2569).

---

[11]    New York State Department of Motor Vehicles ("DMV") records confirmed that on January 30, 2013, the woman that Halyard identified as the mother of Lobban's child was the registered owner of a gray Chevy Impala.  (T. 1783-89).  Reynaldo Hernandez also testified at trial that Lobban was driving a silver Chevy Impala in January of 2013.  (T. 1148).

[12]    Indeed, the entire cross-examination of Det. Colby dealt with topics related to the Gardner attempted murder.  The government objected to these lines of cross-examination as beyond the scope of the government's direct of Det. Colby.  However, the Court overruled

Ultimately, Osborne elected not to call Hernandez or any other witnesses.  Nor did he testify.
(T. 2653-54).

I.   Verdict

On April 11, 2016, the jury convicted Osborne of all counts of the indictment.
(T. 3021-34).

III.   Sentencing and Appeals

On January 17, 2017, the Court entered its judgment sentencing Osborne to
three consecutive life terms to be followed by a mandatory 135 years' to be run consecutively.

On August 30, 2018, the Second Circuit affirmed the Court's judgment.

On December 5, 2019, the Court received the instant petition, but the
handwritten date on the petition is November 23, 2019 and the post-mark on the envelope
containing the petition is listed as November 26, 2019.

TIMELINESS OF OSBORNE'S PETITION

Osborne filed the instant petition within the limitations period.  Section 2255's
limitations provisions establish a one-year period in which federal prisoners may seek habeas
relief.  28 U.S.C § 2255(f); Mickens v. United States, 148 F.3d 145, 148 (2d Cir. 1998).  The
one-year period begins to run from the latest of:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created
> by governmental action in violation of the Constitution or laws of
> the United States is removed, if the movant was prevented from
> making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized
> by the Supreme Court, if that right has been newly recognized by
> the Supreme Court and made retroactively applicable to cases on
> collateral review; or

---

the government's objections and allowed the defense wide latitude to explore the topics
related to the Gardner attempted murder.  (T. 2430-2443).

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f)(1)-(4).

In Clay v. United States, the Supreme Court held that a conviction becomes final when the Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." 537 U.S. 522, 527 (2003). "[A] petition for a writ of certiorari must be filed within 90 days of the entry of the judgment sought to be reviewed." Bowles v. Russell, 127 S.Ct. 2360, 2365 (2007); Supreme Court Rule 13.1.

Here, Osborne filed the instant motion within one year after the judgment became final. As discussed above, the Second Circuit affirmed Osborne's judgment on August 30, 2018. Since Osborne never filed a petition for a writ for certiorari, the judgment became final on November 30, 2018 -- 90 days after the entry of judgment sought to be reviewed. Because the defendant mailed the petition before November 30, 2019—on either November 23, 2019 or November 26, 2019—which was within a year after the judgment became final, the motion was timely filed.

**ARGUMENT**

In his petition, Osborne argues that his conviction must be vacated based on: (1) ineffective assistance of counsel; (2) newly discovered evidence; and (3) the Supreme Court's recent decision in United States v. Davis, 139 S. Ct. 2319 (2019). The government will address each argument in turn.

I.   Osborne's Claims of Ineffective Assistance of Counsel Should Be Denied as They are Without Merit

Osborne alleges ineffective assistance on the following grounds: (a) trial counsel and appellate counsel were ineffective for failing to allege a Brady violation related to phone records of government witness Denzel Smith (Grounds 2 and 3); (b) trial counsel was ineffective for failing to cross examine Detective Colby about when law enforcement first learned that Osborne did not shoot Maurice Gardner (Ground 5); (c) trial counsel was ineffective for failing to cross examine Special Agent Biddiscombe about the identity of an informant relating to a 2011/2012 firearm transaction (Ground 6); and (d) trial counsel was ineffective for failing to call Detective Mitchell as a defense witness (Ground 7). Each one of these claims are baseless and should be rejected.

A.   Legal Standard

A petitioner advancing an ineffective assistance of counsel claim bears a substantial burden. Ineffective assistance of counsel "may appropriately be raised for the first time in a 2255 motion, 'whether or not the petitioner could have raised the claim on

direct appeal.'" <u>Harrington v. United States</u>, 689 F.3d 124, 129 (2d Cir. 2012) (quoting <u>Massaro v. United States</u>, 538 U.S. 500, 504, 509 (2003)).   A petitioner claiming ineffective assistance of counsel "must show that (1) counsel's performance was objectively deficient, and (2) petitioner was actually prejudiced as a result." <u>Id</u>. (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 692-93 (1984)).

 The burden of showing ineffective assistance is "a heavy one because, at the first step of analysis, [a court] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Harrington</u>, 689 F.3d at 129 (internal quotations and citation omitted).   "The determinative question at this step is not whether counsel 'deviated from best practices or most common custom,' but whether his 'representation amounted to incompetence under prevailing professional norms.'" <u>Id</u>. at 129-30 (quoting <u>Harrington v. Richter,</u> 562 U.S. 86, 105 (2011)).   The standard for evaluating the adequacy of counsel's representation is "a most deferential one," <u>Harrington</u>, 562 U.S. at 105, because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," <u>United States v. Thomas</u>, 608 Fed.Appx. 36, 38 (2d Cir. 2015) (Summary Order) (quoting <u>Strickland</u>, 466 U.S. at 690).   "A lawyer's decision not to pursue a defense does not constitute deficient performance, if, as is typically the case, the lawyer has a reasonable justification for the decision." <u>Deluca v. Lord</u>, 77 F.3d 578, 588 n. 3 (2d Cir. 1996).   "'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'"   <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 690-91).

 To show the requisite prejudice at the second step, a petitioner must show "a reasonable probability that his reliance on counsel's ineffective assistance affected the outcome of the proceedings."   <u>Pham v. United States</u>, 317 F.3d 178, 182 (2d Cir. 2003).   "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.   "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." <u>Lindstadt v. Kean</u>, 239 F.3d 191, 204 (2d. Cir. 2001) (quoting <u>Strickland</u>, 466 U.S. at 691).   "Unlike the determination of trial counsel's performance under the first prong of <u>Strickland</u>, the determination of prejudice 'may be made with the benefit of hindsight.'"   <u>Hemstreet v. Greiner</u>, 491 F.3d 84, 91 (2d Cir 2007) (quoting <u>Mayo v. Henderson</u>, 13 F.3d 528, 534 (2d Cir. 1994)).

 When a petitioner makes conclusory allegations, unsupported by specific facts, or contentions which are not credible in light of the record available to the court, the allegations are subject to summary dismissal.   <u>Blackledge</u> at 74; (citing <u>Machibroda v. United States</u>, 368 U.S. 487, 495-96 (1962)).

B.  Discussion

    1.  <u>Trial Counsel and Appellate Counsel Were Not Ineffective For Failing to Allege a</u>
       <u><em>Brady</em> Violation Relating to the Government's Failure to Produce Smith's Phone</u>
       <u>Records That the Government Did Not Even Possess</u>

         Osborne contends that a <u>Brady</u> violation occurred when the government
"failed to turn over government witness Denzel Smith (sic) phone records, text messages and
cell tower information from the day of October 13, 2012 shooting of Maurice Gardner."
<u>Raphael Osborne's Memorandum of Law in Support</u>, ECF Doc. No. 629 at 2.  That
contention is wholly without merit.

         In <u>Brady v. Maryland</u>, the Supreme Court held "that the suppression by the
prosecution of evidence favorable to an accused upon request violates due process where the
evidence is material either to guilt or to punishment, irrespective of the good faith or bad
faith of the prosecution."  373 U.S. 83, 87 (1963).  The duty to disclose such evidence is
applicable even though there has been no request by the accused and that the duty
encompasses impeachment evidence as well as exculpatory evidence.  <u>See</u> <u>Strickler v.</u>
<u>Greene</u> 527 U.S. 263, 280 (1999) (internal citations omitted).  Such evidence is material "if
there is a reasonable probability that, had the evidence been disclosed to the defense, the
result of the proceeding would have been different."  <u>United States v. Bagley</u>, 473 U.S. 667,
682 (1985); <u>see</u> <u>also</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 433–434 (1995).  Moreover, the rule
encompasses evidence "known only to police investigators and not to the prosecutor."  <u>Id</u>., at
438.  In order to comply with <u>Brady</u>, therefore, "the individual prosecutor has a duty to learn
of any favorable evidence known to the others acting on the government's behalf in this case,
including the police."  <u>Id</u>. at 437.  To summarize, "[t]here are three components of a true
<u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is
exculpatory, or because it is impeaching; that evidence must have been suppressed by the
State, either willfully or inadvertently; and prejudice must have ensued."  <u>Strickler v.</u>
<u>Greene</u>, 527 U.S. at 281-282.

         Here, Osborne does not, and cannot, establish any of the essential elements of
a <u>Brady</u> violation.  The reason for this is simple.  The government is not, and never was, in
possession of any phone records for Denzel Smith for the time surrounding the shooting of
Gardner.  Indeed, Smith was never able to provide law enforcement with his cell phone
number from the time of the Gardner shooting.[13]  That is not surprising because Smith
testified that Derick Hernandez instructed him to get rid of his phone number in the days

---

[13]     Smith first met with local law enforcement on September 12, 2013,
approximately eleven months after shooting Gardner. At that time, Smith indicated he did
not recall his phone number and was not forthcoming about his role in the shooting of
Gardner.  It was not until June 8, 2015, when Smith first met with federal law enforcement,
that he admitted his role in the shooting of Gardner.  At no point was Smith able to provide
law enforcement with his phone number from the time of the Gardner shooting.

after the shooting, and Smith complied with this directive. (T. 2072). Because the government did not possess Smith's records, and therefore could not have suppressed said records, Osborne fails to establish a <u>Brady</u> violation.

Furthermore and significantly, in the absence of the records, this Court is left with nothing but Osborne's self-serving assertions of what he believes Smith's records would have demonstrated. Such rank speculation plainly cannot form the basis of a valid <u>Brady</u> claim. Because Osborne cannot establish that a <u>Brady</u> violation had, in fact occurred, this Court cannot find that both trial counsel and appellate counsel's failure to raise such a meritless claim was objectively deficient or that Osborne was actually prejudiced as a result.

2. <u>Trial Counsel Actually Cross Examined Detective Colby About When He Learned That Osborne Did Not Shoot Gardner</u>

In Ground Five of his petition, Osborne alleges trial counsel was ineffective for failing to cross examine Det. Colby about when it was that Det. Colby and his partner first learned that Osborne was not the individual who shot Gardner. This claim, on its face, is frivolous. Trial counsel did, in fact, cross-examine Det. Colby about that very issue. (T. 2430-2442). Specifically, trial counsel asked "[w]hen did you learn that it was not Raphael Osborne, did you ever form a conclusion in that regard?" (T. 2441). Det. Colby answered, "After April 17th, some time when we had some people – Aaron Halyard had said that Mr. Raphael Osborne was involved but he wasn't the shooter. And that was the first time." (T. 2441). Trial counsel went on to ask "[a]nd this contact with Mr. Halyard was after April 17th?" (T. 2442). Det. Colby responded "[y]es, I believe it was in June of 2013." (T. 2442).

In fact, it was the only topic about which trial counsel asked Det. Colby. Therefore, because trial counsel did the very thing Osborne now claims counsel failed to do, his ineffective assistance claim fails.

Furthermore, because counsel took the actions Osborne says he should have, Osborne could not possibly be prejudiced by trial counsel's actions.

3. <u>Trial Counsel Was Not Ineffective for His Cross Examination of SA Biddiscombe</u>

In Ground Six of his petition, Osborne alleges that trial counsel was ineffective for not cross-examining SA Biddiscombe about certain documents related to a 2011 and 2012 controlled purchase of firearms. Specifically, Osborne claims these documents prove that SA Biddiscombe testified falsely when SA Biddiscombe testified that he did not know the identity of Abdul Robinson, a confidential informant used in a firearm transaction. However, contrary to Osborne's claims, trial counsel did attempt to cross-examine Biddiscombe about the firearms transaction involving Robinson. (T. 206). Also contrary to Osborne's claims, SA Biddiscombe never denied knowing Robinson; instead, SA Biddiscombe indicated that his memory of the transaction was not completely clear, prefacing his answer by stating "[i]f it is the one I'm thinking of, I would only be guessing here…" SA Biddiscombe went on to describe a transaction in which one informant, Alton Young, participated in the transaction with "another person." At no point did SA Biddiscombe deny knowing Abdul Robinson. (T.

206-207).  Again, because trial counsel attempted to do the very thing Osborne claims he should have done, it is clear that counsel's actions in cross-examining SA Biddiscombe were not objectively unreasonable.

Furthermore, even if counsel's actions were not objectively reasonable, Osborne cannot demonstrate that he was prejudiced.  Indeed, the minor inconsistency of which informant participated in a deal in which Osborne was not alleged to have been involved (T. 207) would not have altered the outcome in light of the overwhelming evidence against Osborne.  Strickland, 466 U.S. at 694 (a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different).

4.   Trial Counsel Was Not Ineffective for Not Calling Det. Mitchell as a Witness

Finally, in Ground Seven of his petition, Osborne contends that trial counsel was ineffective for failing to call Det. Mitchell as a defense witness at trial.  Osborne submits that Det. Mitchell should have been called, in essence, to re-litigate the accuracy of statements made by Det. Mitchell in a wiretap affidavit submitted in connection with the original Nassau County prosecution of Osborne.  As the Court is well aware, these issues were litigated and decided by the Court in Osborne's original motion to suppress the wiretap (United States v. Osborne, 14-CR-264 (S-5) (JS), ECF Doc. Nos. 176, 177, 183, 192 and 193), as well as in connection with Osborne's direct appeal (United States v. Osborne, 14-CR-264 (S-5) (JS), Second Circuit Mandate, ECF Doc. No. 556, at 5-6).

Following the close of the government's case at trial, trial counsel attempted to call Det. Mitchell and Det. Colby.  Trial counsel informed the Court that Osborne wanted them called so that trial counsel could question them about "[t]he investigation as it related to the phone call analysis, cell phone tower records and …knowledge and participation in the charge of Mr. Osborne with illegal gun sales in the first state indictment.  That's what I'm told the line of inquiry should be." (T. 2557).  Trial counsel explained that the defendant was seeking to make the same inquiry of both detectives. (T. 2560).  Even the defendant himself addressed the Court and raised that he wanted to cross-examine Det. Mitchell about statements that were contained in a state wiretap application. (T. 2561).  The government opposed this application on relevance grounds, pointing out that none of Osborne's phone records or cell tower records, or any analysis of those records were offered at trial.  (T. 2557).  The government further argued that the parties had already litigated, and the Court had already found admissible, the wiretap that resulted from Det. Mitchell's affidavit and that Osborne had already raised the issue of the cell phone records, cell tower records and certain statements of Det. Mitchell in a pre-trial challenge to the wiretap that the Court rejected.  (T. 2557-2558).  The government reiterated that because none of the cell phone records, cell tower records, or statements by Det. Mitchell had been placed before the jury at trial, the basis to call Det. Mitchell proffered by the defendant were all irrelevant.  (T.2558). The Court ultimately did not permit Osborne to call Det. Mitchell or to recall Det. Colby.  (T. 2569).  At no point, when personally addressing the Court regarding his desire to call Det. Mitchell, or Det. Colby, did Osborne ever raise that

he wanted to inquire about Gary Mosley, an individual who at the time of trial was cooperating witness, actually ordering the Gardner's murder.

On direct appeal, Osborne claimed that the Court's decision to admit the wiretap based upon Det. Mitchell's affidavit was error and that the Court's decision to preclude the defense from calling Det. Mitchell at trial was also error.[14]  The Second Circuit rejected all of these claims by Osborne and affirmed the judgment of this Court.  See United States v. Osborne, 14-CR-264 (S-5) (JS), Second Circuit Mandate, ECF Doc. No. 556, at 5-6, 8.

Osborne's instant claim is merely an attempt to raise these arguments again, in the guise of an ineffective assistance of counsel claim.  First, because these claims were raised on direct appeal, generally, they are foreclosed barring an intervening change in the law.  See United States v. Becker, 502 F.3d 122, 127 (2d Cir. 2007) (internal citations omitted).  Even if this Court were to consider the substance of this claim, it must be rejected as counsel did endeavor to call Det. Mitchell as a witness.  (T 2554-2569).  The Court properly denied this request, and the Second Circuit affirmed this Court's denial.  Therefore, trial counsel could not have been ineffective as counsel attempted to take the exact action that Osborne claims counsel failed to take.  The fact that the Court sustained the government's objection to counsel action does not render counsel's performance objectively deficient.  And again, because counsel took the actions Osborne says he should have, Osborne could not possibly be prejudiced by trial counsel's actions.

5. Trial Counsel Did Not Advise Osborne that He Would be Acquitted of the Gardner Shooting

Osborne alleges that trial counsel "promised Osborne that he cannot be convicted of ordering hit on C.I. Gardner because gov. (*sic*) witness Gary Mosley was charged with ordering hits on C.I. and he promised that Gary Mosley phone calls ordering hits on 2 C.I.s will be played for jurors at Osbornes (sic) trial."  See United States v. Osborne, 14-CR-264 (S-5) (JS), Second Circuit Mandate, ECF Doc. No. 629, at 15.  He is wrong.  Trial counsel, a skilled and experienced federal criminal defense attorney, submitted an affidavit refuting that bald assertion.  (Affidavit of John Carman, Esq., dated July 17, 2020, a copy of which is attached hereto as Exhibit 1).  Indeed, Mr. Carman averred that "at no time did I promise Osborne that he would not be convicted of ordering a hit on Maurice Gardner, nor any other crime charged against him.  During my representation of Osborne, I regularly counseled him on the risks of proceeding to trial and the possibility that he could be convicted of any or all of the crimes charged in the indictment against him."  Id.

Contrary to Osborne's self-serving contention, Mr. Carman never advised him that he would be acquitted of the Gardner shooting.  The Court should credit Mr. Carman's affirmation over Osborne's self-serving statements because the former's "description of events

---

[14]     For the first time, on direct appeal, Osborne claimed that he should have been allowed to call Det. Mitchell to inquire about Gary Mosley.

[is] eminently credible." See Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (affirming the district court's denial of defendant's habeas petition without an evidentiary hearing, but after a review of the submitted papers, including a detailed affidavit from trial counsel). Moreover, the Court has discretion to "avoid[] the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would . . . result[] from a full testimonial hearing," and deny Osborne's claim in its entirety. See id. Even if the allegations are true, which they are not, Osborne cannot demonstrate prejudice by this purported error.

II.   Osborne's Claim of Newly Discovered Evidence Is Meritless

In Ground One of his petition, Osborne claims newly discovered evidence, i.e., the Affidavit of Kurtis Phillip (ECF Doc. No. 629, at 19-20) supports his claim that the government knowingly used false testimony of Denzel Smith to convict the defendant of his role in the attempted murder of Gardner.[15]  For the reasons set forth below, this claim is without merit.

It is well settled that "it is the knowing use by the Government of false evidence that constitutes the denial of due process." Silverman v. United States, 556 F.2d 655, 658 (2d Cir. 1977) (quoting Hoffa v. United States, 339 F.Supp. 388, 398 (E.D.Tenn. 1972), aff'd 471 F.2d 391 (6th Cir. 1973), cert. den., 414 U.S. 880 (1973)). Motions for a new trial based upon the identification of perjured testimony should be granted only with great caution and in the most extraordinary circumstances.  See United States v. DiPaolo, 835 F.2d 46, 49 (2d Cir. 1987).  The defendant must prove that: (1) the witness actually committed perjury; (2) the alleged perjury was material; (3) the government knew or should have known of the perjury at the time of the trial; and (4) the perjured testimony remained undisclosed during the trial. United States v. Josephberg, 562 F.3d 478, 494 (2d Cir. 2009).  The Second Circuit has held that the "threshold inquiry is whether the evidence demonstrates that the witness *in fact* committed perjury."  United States v. White, 972 F.2d 16, 20 (2d Cir. 1992) (emphasis supplied).  See also United States v. Moore, 54 F.3d 92, 99 (2d Cir. 1995).  Here, as set forth below, Osborne's claims cannot survive this essential threshold inquiry.  Nothing put forth by Osborne demonstrates that government witness Denzel Smith committed perjury.

In his affidavit, Phillip attempts to discredit government witness Denzel Smith by making several claims, none of which prove that Smith testified falsely nor that the government was aware of any false testimony.  The government will address each of the factual claims in Phillip's affidavit in turn.

---

[15]    To the extent that Osborne also argues that the phone records and cell site records of Denzel Smith also exonerate him, as set forth above, the government has never been in possession of any such records, nor does Osborne claim to be in possession of such records.  Therefore, Osborne's claims regarding what such records would show are aspirational and without any factual support.

First, Phillip claims that the government ignored "cell phone tower records" which, according to Phillip would show that Osborne, Hernandez, Phillip and Smith never met together to discuss the plan to murder Gardner.  See Affidavit of Kurtis Phillip, ECF Doc. No. 629, at 19.  As set forth above, the government has never possessed any phone number or phone record for Denzel Smith.  Furthermore, during trial, Smith was not able to provide the specific date when the meeting happened.

Second, Phillip's declares that "All of the parhes (sic) mentioned above were subject of government wire taps for the entire period in question.  Those wire taps clearly demonstrate that Phillip Rarely (sic), if at all with Osbourne (sic)."  Id.  This assertion is simply incorrect.  Law enforcement never had a wiretap on Phillip's phone or Smith's phone.  Additionally, while law enforcement did obtain permission to wiretap Hernandez and Osborne's phones, those wiretaps did not commence until the early spring of 2013, several months after the attempted murder of Gardner and any meetings which preceded the attempted murder.

Third, Phillip alleges that there is a recording of Maurice Gardner stating, as relevant here, that "Phillip didn't shoot him, and didn't have anything to do with the shooting[.]"  Id.  None of this information is inconsistent with Smith's testimony.  Smith testified that he, not Phillip, shot Gardner.  Smith also testified that Phillip was waiting for Smith one block over from where the shooting was to take place.  (T. 2058-2071).  Furthermore, even assuming Phillip possessed such a recording, it is of no moment as Gardner had no knowledge of Phillip's involvement in the meetings where Osborne, Hernandez, Phillip and Smith discussed the plan to kill him as he obviously was not present for that meeting.

Fourth and finally, Phillip asserts that eye witnesses to the shooting failed to identify him or Osborne as being present at the shooting.  Id. at 20.  With the exception of Gardner, who originally identified Osborne as the shooter, this assertion is correct.  However, civilian eyewitnesses did not identify anyone.  Nor were there any attempted identifications with civilians.  Therefore, nothing about civilian witnesses' inability to make any identification contradicts Smith's testimony.  Regardless, the government did not elicit evidence that Phillip or Osborne were present for the shooting because they were not present.

For these reasons, the Affidavit of Phillip fails to demonstrate that any aspect of Smith's testimony was false.  Indeed, Osborne posits no evidence that demonstrates that Smith testified falsely.  Similarly, even assuming arguendo that Osborne could establish that Smith testified falsely, which he has utterly failed to do, Osborne does not, and cannot, demonstrate that the government was aware of this purportedly false testimony.

III.   Osborne's *Davis* Claim Is Without Merit

In Ground Four of his petition, Osborne claims that his convictions for 924(c) violations related to the attempted murder of Gardner and the two Hobbs Act robberies (Trackside and Fish) must be vacated in light of the Supreme Court's recent decision in United States v. Davis, 139 S. Ct. 2319.  While Davis invalidated some of the predicate

crimes of violence for Osborne's 924(c) convictions, namely, Hobbs Act robbery conspiracy and conspiracy to murder and assault Maurice Gardner, those 924(c) convictions also rested on still valid predicate crimes of violence, namely, substantive Hobbs Act robbery, attempted murder, assault and witness retaliation.  Accordingly, Osborne's claims fail.

A. _Johnson II_ and its Progeny

In Johnson II, the Supreme Court ruled that the portion of the Armed Career Criminal Act defining the term "violent felony" to include any felony that "involves conduct that presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii), was unconstitutionally vague.  135 S. Ct. 2557-60.  Thereafter, defendants sought to apply its reasoning to, among other criminal statutes, 18 U.S.C. § 924(c).  That section imposes a mandatory consecutive term of imprisonment when a defendant uses or carries a firearm during, or possesses a firearm in furtherance of, a crime of violence or drug trafficking crime.  A "crime of violence" is a federal felony that:

> (A)      has as an element the use, attempted use, or threatened use of physical force against the person or property of another (the "Elements Clause"), or
>
> (B)      that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense (the "Residual Clause").

18 U.S.C. § 924(c)(3).  Because the language of subsection (B) resembles in some ways the "violent felony" definition struck down in Johnson II, defendants have argued that the Residual Clause is unconstitutional for the same reasons.

In Sessions v. Dimaya, 138 S. Ct. 1204 (2018), the Supreme Court ruled that the definition of "crime of violence" found in 18 U.S.C. § 16(b) suffered from the same vagueness problems that Johnson II had found to be fatal to section 924(e)(2)(B)(ii), rendering section 16(b) unconstitutional as well. The Court explained that section 16(b) both "calls for a court to identify a crime's 'ordinary case' in order to measure the crime's risk" and also creates "uncertainty about the level of risk that makes a crime 'violent.'" 138 S. Ct. at 1215.  In the course of its ruling, the Court rejected the government's arguments attempting to distinguish section 16(b) from section 924(e)(2)(B)(ii).  Id. at 1218-23.

The Second Circuit first addressed a Johnson II-based challenge to section 924(c) in United States v. Hill, 890 F.3d 51 (2d Cir. 2018) (amended opinion), which held that substantive Hobbs Act robbery, using the categorical approach, satisfies Section 924(c)(3)(A)'s Elements Clause.   Because the Court was addressing a challenge to the Elements Clause, it applied the categorical approach.  Hill, 890 F.3d at 55; see also United States v. Ivezaj, 568 F.3d 88, 95 (2d Cir. 2009); United States v. Acosta, 470 F.3d 132, 134-35 (2d Cir. 2006).  "Under the categorical approach, courts identify the minimum criminal conduct necessary for conviction under a particular statute," examining only the statutory definitions of the offense, not the defendant's conduct in committing it.  Hill, 890 F.3d at 55

(citation omitted).  In applying the categorical approach, the Second Circuit is not guided by hypothetical arguments that a statue may not be construed in a way devoid from real-world application; rather "there must be 'a realistic probability, not a theoretical possibility,' that the statute at issue could be applied to conduct that does not constitute a crime of violence." Hill, 890 F.3d at 56 (quoting Gonzalez v. Duenas-Alvarez, 549 U.S. 183, 193 (2007)); accord Moncrieffe v. Holder, 569 U.S. 184, 191 (2013) (the "focus on the minimum conduct criminalized by the . . . statute is not an invitation to apply 'legal imagination' to the . . . offense").  Osborne therefore must show that the statute was applied in the "manner for which he argues" either in his own case or another's.  Id.

In interpreting the Elements Clause of § 924(c)(3)(A), courts typically look to the Supreme Court's decision in Johnson v. United States, 559 U.S. 133, 139-40 (2010) ("Johnson I"), which interpreted the physical force component of ACCA's similarly-worded Elements Clause as meaning "simply 'violent force — that is, force capable of causing physical pain or injury to another person.'"  Hill, 890 F.3d at 58 (quoting Johnson I, 559 U.S. at 140).  As the Supreme Court recently found,

> the force necessary to overcome a victim's physical resistance is inherently 'violent' in the sense contemplated by Johnson [I] and 'suggest[s] a degree of power that would not be satisfied by the merest touching.'  559 U.S. at 139 . . . .  The altercation [in a robbery] need not cause pain or injury or even be prolonged; it is the physical contest between the criminal and the victim that is itself 'capable of causing physical pain or injury.'  Id., at 140.

Stokeling v. United States, 139 S. Ct. 544, 553 (2019).

The Second Circuit next addressed a Johnson-II-based challenge to section 924(c)(3)(B)'s Residual Clause in United States v. Barrett, 903 F.3d 166 (2d Cir. 2018) ("Barrett I"), rev'd in relevant part by United States v. Barrett, 937 F.3d 126 (2d Cir. 2019) ("Barrett II"), where it: (1) reaffirmed that, in light of Hill, a Hobbs act robbery is categorically a crime of violence under § 924(c)(3)(a); (2) held that a conspiracy to commit a Hobbs act robbery is categorically a crime of violence under section 924(c)(3)(b); and (3) held in the alternative that the logic in Dimaya and Johnson II demands that courts apply a conduct-specific approach, as opposed to a categorical approach, to section 924(c)'s residual clause, which avoids constitutional concerns and therefore saves the clause.  Barrett I, 903 F.3d at 174-75, 177-79, 181-84.

On June 24, 2019, the Supreme Court decided Davis and held that section 924(c)'s residual clause was unconstitutionally vague in light of Dimaya and Johnson II.  139 S. Ct. at 2326-27.  While the Davis Court agreed that the conduct-specific approach could avoid the constitutional concerns identified in Johnson II and Dimaya, it found that the statutory text did not support the use of the conduct-specific approach.  Id. at 2328-29.  The statute's text required the application of the categorical approach and, accordingly, the residual clause was unconstitutionally vague under Johnson II and Dimaya.  Id. at 2329.

19

Davis has therefore abrogated the Second Circuit's holding in Barrett I that the conduct-specific approach applies to section 924(c)'s residual clause and implicitly abrogated the Second Circuit's alternative holding that, under a categorical approach, a conspiracy to commit a crime of violence is itself a crime of violence under the residual clause.  Barrett II, 2019 WL 4121728, at *1-3.  Davis did not impact the Second Circuit's holding in Hill or its interpretation of the Elements Clause.  Barrett II, 937 F.3d at 128.

B. Discussion

1. The 924(c) Conviction Relating to the Gardner Shooting Was Predicated on Attempted Murder, Assault and Witness Retaliation, All of Which Remain Valid Crimes of Violence

In Count Fourteen, the jury convicted Osborne of discharging a firearm in connection with the following five crimes of violence: (1) conspiracy to murder Gardner (Count Nine); (2) attempted murder of Gardner (Count Ten); (3) assault with a dangerous weapon of Gardner (Count Eleven); (4) witness retaliation of Gardner (Count Twelve); and (5) witness retaliation conspiracy of Garner (Count Thirteen).  Although the jury was not given a special verdict sheet requiring them to specify which crimes of violence the government had proven in connection with Count Fourteen, the evidence adduced at trial overwhelmingly established that the government proved all of those crimes of violence.  Indeed, the jury found Osborne guilty of all of those underlying crimes of violence.  While the government agrees that the two conspiracy counts (Counts Nine and Twelve) are no longer valid predicate crimes of violence after Davis, the 924(c) conviction rested on three still valid predicate crimes of violence.

Indeed, Johnson II and its progeny, including Davis, have not altered the status of assault and attempted murder as crimes of violence under the Elements Clause because it requires proof that the defendant used, attempted to use, or threatened to use physical force against another.  The elements of murder in aid of racketeering are (i) murder (ii) "for the purpose of gaining entrance to or maintaining or increasing position in" (iii) "an enterprise engaged in racketeering activity."[16]  18 U.S.C. § 1959(a)(1).  Murder in aid of racketeering unquestionably satisfies the Elements Clause:

> And murder, no matter the degree, entails a "use . . . of physical force" sufficient to trigger the elements clause of § 924(c); this conclusion is compelled because the Supreme Court has defined "physical force," in this context, as "violent force — that is, force capable of causing physical pain or injury to another

---

[16]     The murder alleged as the underlying offense of the Section 1959(a)(5) violation was second-degree murder in violation of  New York Penal Law § 125.25(1).  Under New York law, a person is guilty of second-degree murder when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person."  N.Y. Penal Law § 125.25(1).

> person," Johnson [I], 559 U.S. 133, 140 (2010)—and "[m]urder necessarily entails enough force to cause injury since there can be no greater injury than death."  Bonilla v. United States, No. 07-CR-97, 2017 WL 8813076, at *1 (E.D.N.Y. Aug. 23, 2017).

United States v. Russell, 2018 WL 3213274, at *3 (E.D.N.Y. Jun. 29, 2018) (murder alleged as the underlying violation was second-degree murder in violation of N.Y.P.L. § 125.25(1), which criminalizes murder when "with intent to cause the death of another person, he causes the death of such person or a third person"); United States v. Sierra, 782 F. App'x 16, 20 (2d Cir. 2019) (attempted murder in aid of racketeering qualifies as a "crime of violence" pursuant to § 924(c)(3)(A)); United States v. Praddy, 729 F. App'x 21, 23 (2d Cir.), cert. denied sub nom. Jones v. United States, 139 S. Ct. 185 (2018)  (attempted murder under New York law "is a crime 'unmistakably involving an "attempted use . . . of physical force."'") (quoting United States v. Scott, 681 F. App'x 89, 94-95 (2d Cir. 2017)).  The Second Circuit has rejected an argument that murder cannot be sufficiently forceful since it may be committed by omission, noting that argument was foreclosed by Hill, which explained that the "use of physical force can encompass acts undertaken to cause physical harm, even when the harm occurs indirectly."  Sierra, 782 F. App'x at 20 (quoting Hill, 890 F.3d at 60); see also Villanueva v. United States, 893 F.3d 123, 129 (2d Cir. 2018) ("the relevant force is the impact of the substance on the victim, not the impact of the user on the substance").

While a divided panel of the Second Circuit recently held that New York's first-degree manslaughter statute was not a "violent felony" for purposes of the ACCA because there had been cases where state authorities had prosecuted parents who, despite their duty to act, failed to secure medical treatment for a child who had been beaten or shaken, resulting in the death of their child, see United States v. Scott, - F.3d - , 2020 WL 1522825, at *5-6 (2d Cir. 2020), Osborne can point to no case where a defendant has been prosecuted in New York for an intentional attempted murder premised on an omission, see United States v. Sanchez, 940 F.3d 526, 536 n.8 (11th Cir. 2019); cf. Boykin v. United States, 16-CV-4185(CM), 2020 WL 774293, at *7 (S.D.N.Y. Feb. 18, 2020) (explaining that New York's second-degree murder and first-degree manslaughter have different elements and that first-degree manslaughter cases are not probative as to whether second-degree murder and VICAR murder are crimes of violence).  The government also can find no such case.  Nor can Osborne show a VICAR attempted murder prosecution premised on an omission.  There is, therefore, no "realistic probability" that the statute at issue in Osborne's prosecution "does not constitute a crime of violence."  Hill, 890 F.3d at 56 (quoting Duenas-Alvarez, 549 U.S. at 193); accord Moncrieffe, 569 U.S. at 191 (the "focus on the minimum conduct criminalized by the . . . statute is not an invitation to apply 'legal imagination' to the . . . offense").

It makes no difference that the predicate crime charged here is an attempted murder.  Applying the plain language of the Elements Clause, an attempt to commit a crime of violence is itself an attempt to use physical force.  The Second Circuit has ruled that attempts to commit other crimes of violence are themselves crimes of violence.  See United States v. Tabb, 949 F.3d 81, 85–86 (2d Cir. 2020) (Attempted Assault in the Second Degree

under New York law is categorically a crime of violence for purposes of the Sentencing Guidelines' Career Offender provisions); United States v. Sierra, 782 F. App'x 16, 19–20 (2d Cir. 2019) ("attempted murder is a crime unmistakably involving an attempted use of physical force" for purposes of Section 924(c)(3)(A)); United States v. Praddy, 729 F. App'x 21, 24 (2d Cir.) (same), cert. denied, 139 S. Ct. 185 (2018) ; United States v. Scott, 681 F. App'x 89, 95 (2d Cir. 2017) (same), cert. denied, 138 S. Ct. 642 (2018); United States v. Walker, 442 F.3d 787, 789 (2d Cir. 2006) (Attempted Assault in the Second Degree under New York law is a "violent felony" under ACCA's force clause) (reaffirmed by Tabb, 949 F.3d at 85-86).

   As the Seventh Circuit has explained, an attempt to commit a crime of violence is also a crime of violence.  See United States v. Hill, 877 F.3d 717, 719 (7th Cir. 2017) (attempted murder satisfies ACCA's Elements Clause).  This is so for two reasons.  First, to establish that an attempt crime occurred, the government must offer "proof of intent to commit all elements of the completed crime."  Id.  Second, a defendant need not use actual force to commit a crime of violence because § 924(c)(3)(A) specifies that "attempted force" is sufficient.  Id.  Combining these premises, "[w]hen a substantive offense would be a violent felony under § 924(e) and similar statutes, an attempt to commit that offense also is a violent felony."

   Additionally, most courts to consider attempted Hobbs Act robbery have concluded that it is a crime of violence under Section 924(c)(3)(A).  See, e.g., United States v. St. Hubert, 909 F.3d 335, 351 (11th Cir. 2018) ("attempted Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(A)'s use-of-force clause because that clause expressly includes 'attempted use' of force"); Hill v. United States, 877 F.3d 717, 718-19 (7th Cir. 2017) ("When a substantive offense would be a violent felony under § 924(e) and similar statutes, an attempt to commit that offense also is a violent felony."); Brown v. United States, 2016 WL 4491852, at *2 (W.D. Mo. Aug. 25, 2016) (denying § 2255 motion  where underlying convictions were for attempted Hobbs Act robbery and brandishing a weapon in furtherance thereof because attempted Hobbs Act robbery is a crime of violence and denying a certificate of appealability); Camacho v. United States, 2018 WL 889456, at *9 (S.D. Fla. Jan. 22, 2018) ("Hobbs Act robbery and attempted Hobbs Act robbery are categorically crimes of violence."), report and recommendation adopted, 2018 WL 898229 (S.D. Fla. Feb. 13, 2018); United States v. Johnson, 2018 WL 3518448, at *4 (D. Nev. Jul. 19, 2018); United States v. Crawford, 2018 WL 1123879, at *2 (W.D. Okla. Mar. 1, 2018); see also Charlton v. United States, 725 F. App'x 881 (11th Cir. 2018) (aiding and abetting an attempted Hobbs Act robbery is a crime of violence under the Elements Clause); cf. United States v. Thrower, 914 F.3d 770, 777 n.6 (2d Cir. 2019) (for purposes of ACCA, "an attempt to threaten to use force . . . itself constitutes a 'threatened use of physical force'"); United States v. Pereira-Gomez, 903 F.3d 155, 166 (2d Cir. 2018) (attempt crimes qualify under similarly worded Elements Clause under the Sentencing Guidelines; attempt under New York state law "requires that the action taken by an accused be 'so near to its accomplishment that in all reasonable probability the crime itself would have been committed, but for timely interference.'"); United States v. Armour, 840 F.3d 904, 908-08 (7th Cir. 2016) (attempted armed bank robbery qualifies as a crime of violence under the

Elements Clause); Leyones v. United States, 2018 WL 1033245, at *6 (E.D.N.Y. Feb. 22, 2018) (attempted bank robbery satisfies Elements Clause).

        Similarly, claims that crime of violence convictions that were established under an aiding and abetting theory mean that a defendant could have been convicted without his having committed a sufficiently forceful act, have been repeatedly rejected.  Because aiders and abettors are "punishable as a principal," 18 U.S.C. § 2, they are no different under the categorical approach than the defendant who actually commits the substantive offense. "Aiding and abetting is simply an alternative theory of liability; it is "not a distinct substantive crime."  United States v. Richardson, 906 F.3d 417, 426 (6th Cir. 2018) ("For purposes of sustaining a conviction under § 924(c), it makes no difference whether Richardson was an aider and abettor or a principal.")  (quoting United States v. McGee, 529 F.3d 691, 695-96 (6th Cir. 2008)).  Other Circuits have rejected such arguments in addressing Johnson I-based challenges to Hobbs Act robbery predicate convictions.  "Because an aider and abettor is responsible for the acts of the principal as a matter of law, an aider and abettor of a Hobbs Act robbery necessarily commits all the elements of a principal Hobbs Act robbery."  United States v. Deiter, 890 F.3d 1203, 1215 (10th Cir. 2018)  (quoting In re Colon, 826 F.3d 1301, 1305 (11th Cir. 2016));  accord United States v. Garcia-Ortiz, 904 F.3d 102, 109 (1st Cir. 2018) (rejecting argument that aiding and abetting Hobbs Act robbery cannot categorically constitute a crime of violence); United States v. Tibbs, 685 F. App'x 456, 465 (6th Cir. 2017) (same); Colon, 826 F.3d at 1305 ("Because an aider and abettor is responsible for the acts of the principal as a matter of law, an aider and abettor of a Hobbs Act robbery necessarily commits all the elements of a principal Hobbs Act robbery.").

        Indeed, the Second Circuit in Stuckey v. United States, 878 F.3d 62 (2d Cir. 2017), rejected a similar argument by a petitioner challenging his conviction under ACCA who asserted that his first-degree robbery conviction did not satisfy Johnson I and Leocal[17] because a co-defendant could have discharged a firearm without the defendant intending for such violence to occur.  The Second Circuit explained that

> ACCA requires only a threshold intent to engage in criminal conduct.  The New York statute satisfies this standard because the state must first establish the defendant's intent to commit robbery, and separately establish that during that robbery, a member of the robbery committed one of the aggravating acts for an enhanced penalty to apply.

878 F.3d at 70-71.  Ordering the murder of an individual that results in the attempted murder and assault of that intended target clearly would satisfy the Elements Clause.

---

[17]    See Leocal v. Ashcroft, 543 U.S. 1 (2004).

In sum, because Osborne's 924(c) conviction (Count Fourteen) was predicated on attempted murder, which remains a valid predicate crime of violence, Osborne's claim fails.

Likewise, Osborne's 924(c) conviction was predicated on assault in aid of racketeering. There can be no serious dispute that assault with a deadly weapon in aid of racketeering categorically qualifies as a "crime of violence" under Section 924(c)(3)(A) because it requires proof that the defendant used, attempted to use or threatened to use physical force against another.  See United States v. Houston, 732 F. App'x 24, 29 (2d Cir. 2018) (assault in the first degree with intent to cause physical injury to another in violation of N.Y.P.L. § 120.10(1) satisfies the Elements Clause of the Sentencing Guidelines); United States v. Walker, 442 F.3d 787, 788 (2d Cir. 2006) ("[C]ategorically, his conviction [of attempted assault in the second degree] involved an attempt to cause physical injury by means of a deadly weapon or dangerous instrument: To (attempt to) cause physical injury by means of a deadly weapon or dangerous instrument is necessarily to (attempt to) use 'physical force,' on any reasonable interpretation of that term. . . ."); Rodney v. United States, 2019 WL 2571150, at *4 (E.D.N.Y. Jun. 20, 2019) (assault in aid of racketeering); Young v. United States, 2019 WL 2162946, at *5 (E.D.N.Y. May 16, 2019) (assault in the first degree with intent to cause serious physical injury).  In fact, the Second Circuit recently held in a summary order after Davis, that the exact same statute at issue here, namely, assault in violation of New York State Penal Law § 120.05(2), was a crime of violence under the Elements Clause.  See United States v. Michael Smith, 19-CR-1624 at 4-5(2nd Cir. May 20, 2020) (affirming Section 924(c) conviction where the predicate crime of violence was assault in violation of N.Y.P.L. § 120.05(2)) (summary order), a copy of which is attached hereto as Exhibit 2.

Moreover, in analogous contexts, the Second Circuit has held after Johnson II, that N.Y.P.L. § 120.05(2) constitutes a "crime of violence" under the Elements Clause of the statute or Sentencing Guideline provision at issue.  See Tabb, 949 F.3d at 84-85 (holding that N.Y.P.L. § 120.05(2) was a "crime of violence" for purposes of the Career Offender Guidelines); Singh v. Barr, 939 F.3d 457, 463-64 (2d Cir. 2019) (per curiam) (a conviction for N.Y.P.L. § 120.05(2) is an aggravated felony that satisfies 18 U.S.C. § 16(a)).  No persuasive argument exists for treating this provision different here.

Accordingly, because assault remains a valid predicate crime of violence, Osborne's 924(c) conviction should not be disturbed.

Furthermore, Osborne's 924(c) conviction was also predicated on witness retaliation, in violation of 18 U.S.C. 1513(a)(1)(B), which provides, in relevant part: "[w]hoever kills or attempts to kill another person with intent to retaliate against any person for …providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense …shall be punished[.]"  When analyzing this very statute, post-Johnson II, under the categorical approach, the Fourth Circuit held that witness retaliation by murder is "a crime of violence under § 924(c)'s force clause because it has an element the use, attempted use, or threatened use of physical force against the person."  In re Irby, 858 F.3d 231, 234 (4th Cir. 2017) (internal quotations and citations omitted); see also,

24

United States v. Bowen, 936 F.3d 1091, 1102-1103 (10th Cir. 2019) (holding that witness retaliation under Section 1513(b) is not a crime of violence because while "witness retaliation through bodily injury qualifies as a crime of violence under 924(c)(3)'s elements clause, but witness retaliation through property damage does not."). As noted above, an attempt to commit a crime of violence is a crime of violence. Here, because "one cannot unlawfully kill a human being without a use of physical force capable of causing pain or injury to another…retaliatory murder falls within the force clause." In re Irby, 858 F.3d at 238.

Therefore, as with attempted murder and assault, because witness retaliation in violation of 1513(a)(1)(B) remains a valid predicate crime of violence, Osborne's 924(c) conviction should not be disturbed.

Because Osborne failed to raise a vagueness challenge before trial or object to the jury charge in a way relevant to the Davis issue, his claim should be reviewed for plain error. "Plain error" is error that is clear or obvious, which affected the defendant's substantial rights and seriously impugns the "fairness, integrity, or public reputation of judicial proceedings." United States v. Marcus, 560 U.S. 258, 262 (2010) (internal quotation marks omitted). Had Osborne raised a timely challenge, the Court could have easily required a special verdict form in relation to the 924(c) charges or the government could have elected to pursue the valid predicates in the indictment. Having failed to object, Osborne should not reap a windfall now that the law has changed in his favor where his convictions indisputably involved violent crimes such as attempted murder, assault and robbery; instead, Osborne should prevail only if the error prejudiced him. See Skilling v. United States, 561 U.S. 358, 414 (2010) (constitutional error occurs if jury is instructed on alternative theories of guilt, one of which is legally invalid, but that error is subject to harmless-error analysis).

Any error in the Court's instruction permitting the jury to predicate the 924(c) conviction on the murder conspiracy was harmless because the jury necessarily also predicated the conviction on the attempted murder or assault, which, as discussed above, qualify as crimes of violence under Section 924(c)'s Elements Clause.

If there are multiple possible bases for finding a predicate crime of violence under Section 924(c), collateral relief is unwarranted unless the petitioner can establish that the jury necessarily relied solely on a predicate offense that constituted a crime of violence under the Residual Clause as opposed to the Elements Clause, and the offense would not qualify as a "drug trafficking crime" under Section 924(c)(2). See United States v. Ventura, 742 F. App'x 575, 578 (2d Cir. 2018) (finding no plain error in Johnson II challenge to a Section 924(c) conviction linked to arson and drug trafficking because the jury needed only to find the drug trafficking predicate (or both), cert denied, 2019 WL 4921442 (Oct. 7, 2019); United States v. Vasquez, 672 F. App'x 56, 61 (2d Cir. 2016) (finding "no Yates concern arises from a possible defect in a related 'crime of violence' predicate" where verdict was supported by narcotics predicates); United States v. John, 2017 WL 318804, at *1 n.1 (E.D.N.Y. Jan. 23, 2017) (rejecting argument that court failed to require jury to unanimously agree which of four crimes supported conviction of firearms offense because "the jury validly reached a unanimously guilty verdict on every predicate crime alleged" and,

thus, "the erroneous jury instruction was necessarily harmless") (quoting <u>United States v. Gomez</u>, 580 F.3d 94, 104 (2d Cir. 2009)); <u>see also</u> <u>United States v. Anglin</u>, 16-2065, CDE 41 at 1 (2d Cir. Aug. 20, 2019) ("Because we conclude that bank robbery under § 2113(a) and (d) remains a proper predicate offense after <u>Johnson</u>, <u>Dimaya</u>, and <u>Davis</u>, and because only one predicate offense is required, we need not decide whether the conspiracy conviction is also a crime of violence after those decisions.").

There is no rational basis upon which the jury could have predicated the 924(c) conviction on the conspiracy but not the attempted murder or assault.  The 924(c) count alleged the use of a firearm during and in relation to the assault and attempted murder of Gardner, and the only dangerous weapon used in connection with those crimes was a firearm.  Because the jury convicted Osborne of the assault and attempted murder of Gardner, there can be no dispute that the jury predicated the 924(c) conviction on the use of a firearm during those crimes.  See <u>Vasquez</u>, 672 F. App'x at 61 (affirming Section 924(c) convictions where invalid robbery and valid narcotics conspiracy predicates were inextricably intertwined and jury found narcotics predicate proved, such that there was no possibility verdict rested only on invalid robbery predicate).  Accordingly, any error in instructing the jury that it could predicate the 924(c) conviction on the conspiracy count was harmless.

> 2.  <u>The 924(c) Conviction Relating to the Fish and Trackside Robberies Were Predicated on Substantive Robbery, Which Remains a Valid Crime of Violence</u>

In Count Five, the jury convicted Osborne of brandishing firearms in connection with the following two crimes of violence: (1) Hobbs Act robbery conspiracy (the Fish Robbery) (Count Three); and (2) substantive robbery (Count Five).  In Count Eight, the jury convicted Osborne of brandishing firearms in connection with the following two crimes of violence: (1) Hobbs Act robbery conspiracy (the Trackside Robbery) (Count Six); and (2) substantive robbery (Count Seven).  As set forth above, although there was no special verdict sheet, the evidence adduced at trial overwhelmingly established that the government proved all of those crimes of violence.  Indeed, the jury found Osborne guilty of both the substantive robberies and the conspiracy counts for each of the two different robberies.  Because the two 924(c) convictions were predicated on substantive robbery counts, which remain valid crimes of violence after <u>Davis</u>, Osborne's motion to dismiss those counts fails.

The Hobbs Act provides, in relevant part that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery … or attempts or conspires so to do" shall be guilty of an offense.  18 U.S.C. § 1951(a).  Robbery is defined as:

> The unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or

member of his family or of anyone in his company at the time of
the taking or obtaining.

18 U.S.C. § 1951(b)(1).

As set forth above, following <u>Davis</u>, the Second Circuit held in <u>Barrett v. United States</u>, 937 F.3d at 129–30 (2d Cir. 2019), that conspiracy to commit Hobbs Act robbery did not qualify as a crime of violence under the Force Clause, which is the only remaining enforceable definition of "crime of violence" in Section 924(c).

By contrast, the Second Circuit has held that substantive Hobbs Act robbery is a crime of violence under the Elements Clause.  <u>See</u> <u>Hill</u>, 890 F.3d at 53, 60.  That ruling is unaffected by <u>Davis</u>.  <u>See</u> <u>Barrett</u>, 937 F.3d at 128-29 (affirming Section 924(c) convictions predicated on substantive Hobbs Act robbery following <u>Davis</u> based upon <u>Hill</u>).  As the Court in <u>Hill</u> explained, "[t]o determine whether an offense is a crime of violence [under Section 924(c)(3)(A)], courts employ what has come to be known as the categorical approach."  <u>Hill</u>, 890 F.3d at 55 (citing, inter alia, <u>Taylor v. United States</u>, 495 U.S. 575, 600 (1990)).  Under the categorical approach, "courts identify the minimum criminal conduct necessary for conviction under a particular statute.  In doing so, courts look only to the statutory definitions — <u>i.e.</u>, the elements — of the offense, and not to the particular underlying facts."  <u>Id.</u> (quoting, inter alia, <u>Descamps v. United States</u>, 570 U.S. 254, 257 (2013)).  In other words, "[t]he reviewing court cannot go behind the offense as it was charged to reach its own determination as to whether the underlying facts qualify the offense as, in this case, a crime of violence."  <u>Id.</u>

Applying these principles, the Second Circuit in <u>Hill</u> ruled that substantive Hobbs Act robbery is a crime of violence under the Force Clause.  The Court noted that its conclusion was consistent with the unanimous view of other circuits and with the Second Circuit's precedent holding that state law precedent satisfied the similarly-worded definition of a "violent felony" for purposes of the Armed Career Criminal Act ("ACCA")), 18 U.S.C. § 924(e)(2)(B)(i).  <u>Id.</u> at 56 (citing <u>Stuckey v. United States</u>, 878 F.3d 62, 70 (2d Cir. 2017) (finding New York First Degree Robbery a violent felony), <u>cert. denied</u>, 139 S. Ct. 161 (2018), and <u>United States v. Bordeaux</u>, 886 F.3d 189, 194 (2d Cir. 2018) (finding Connecticut First Degree Robbery a violent felony)).  In light of the plain language of the Hobbs Act, which requires proof of the use of "actual or threatened force, or violence, or fear of injury" to the person or property of another, the <u>Hill</u> Court could "discern no persuasive basis to depart from these ample authorities."  <u>Id.</u>  The Court rejected the defendant's various hypothetical arguments as to how Hobbs Act robbery might be committed in a way that would "not include the element necessary to qualify such robberies as crimes of violence for the purpose of § 924(c)(3)(A)."  <u>Id.</u> at 57; <u>see</u> <u>id.</u> at 57-60.

This result is in accord with every other Circuit court to consider the issue since <u>Johnson II</u>.  <u>See</u>, <u>e.g.</u>, <u>United States v. Garcia-Ortiz</u>, - F.3d -, 2018 WL 4403947, *3-5 (1st Cir. 2018); <u>United States v. Greer</u>, 734 F. App'x 125, 128-29 (3d Cir. 2018); <u>United States v. Buck</u>, 847 F.3d 267, 274-75 (5th Cir. 2017); <u>United States v. Gooch</u>, 850 F.3d 285, 290-92 (6th Cir. 2017); <u>United States v. Ingram</u>, 947 F.3d 1021, 1025–26 (7th Cir. 2020); <u>United States v.</u>

Rivera, 847 F.3d 847, 848-49 (7th Cir. 2017); Diaz v. United States, 863 F.3d 781, 783-84 (8th Cir. 2017); United States v. Dominguez, 954 F.3d 1251 (9th Cir. 2020); United States v. Howard, 650 F. App'x 466, 467-68 (9th Cir. 2016); United States v. Moreno, 665 F. App'x 678, 680-81 (10th Cir. 2016); United States v. St. Hubert, 909 F.3d 335, 346 (11th Cir. 2018).

        In sum, because Hobbs Act robbery is a crime of violence, Osborne's § 924(c) convictions relating to the Fish and Trackside robberies are properly predicated on crimes of violence under § 924(c)(3)(A). Therefore, Osborne's Davis claim lacks merit and should be denied. [18]

* * *

        Because Osborne's petition on its face "show[s] that the prisoner is entitled to no relief," this matter should be disposed of without an evidentiary hearing. 28 U.S.C. § 2255(b); see also Garcia Montalvo v. United States, 862 F.2d 425, 426-27 (2d Cir. 1988).

---

[18]    Osborne's petition does not mention his additional 924(c) convictions, one which was based upon the attempted murder in-aid-of racketeering and assault in-aid-of racketeering of rival Bloods member Johnny Green, and the other which was based upon Osborne possessing firearms in furtherance of a conspiracy to distribute controlled substances. As set forth above, attempted murder and assault are still valid predicate crimes of violence. Indeed, Osborne's 924(c) charge related to the shooting of Green was not predicated upon a conspiracy count in any way, and therefore, Davis is inapplicable. Further, Johnson II and its progeny have nothing to do with Osborne's Section 924(c) conviction predicated upon the conspiracy to distribute controlled substances. For that conviction, Osborne was not convicted under Section 924(c)(3) but under Section 924(c)(2). Section 924(c)'s definition of a "drug trafficking crime" lacks a residual clause and is not impermissible vague. See, e.g., McCoy v. United States, 2017 WL 1291766, *1-2 (S.D.N.Y. Apr. 7, 2017). Therefore, Osborne cannot establish any basis for relief related to the other 924(c) convictions.

CONCLUSION

For the foregoing reasons, the Court should deny Osborne's petition in its entirety.

Respectfully submitted,

SETH DuCHARME
Acting United States Attorney

By:     /s/
        Michael R. Maffei
        Christopher C. Caffarone
        Nicole Boeckmann
        Assistant U.S. Attorneys
        (631) 715-7890/7868/7855

cc:     Clerk of the Court (JS) (by ECF)

        Raphael Osborne, Register No. 83520-053 (by U.S. Mail)
        USP Pollock
        United States Penitentiary
        P.O. Box 2099
        Pollock, LA 71467